GRIFFIS, J.,
for the Court.
¶ 1. This case deals with the modification of child custody, contempt and the award of attorney’s fees. This case is unusual because the minor child, identified as E.C.P., had an attorney to file a petition for modification and to represent her throughout the hearing and appeal of this matter. E.C.P.’s attorney, Lawrence Pri-meaux, filed pleadings on E.C.P.’s behalf and participated in the hearing by examining witnesses and offering evidence. We find it necessary to protect the privacy and confidentiality of the matters discussed in this opinion. We will refer to the minor child as E.C.P., her natural mother as “Mother,” and her natural father as “Father.”
¶ 2. Father and E.C.P. appeal the decision of the Chancery Court of Lauderdale County. On appeal, Father argues that: (1) the chancellor erred in holding him in contempt; (2) the chancellor erred in denying his motion for modification of custody; (3) the chancellor erred in awarding $35,000 in attorney’s fees to Mother; and (4) the chancellor erred in failing to hold Mother in contempt. E.C.P. argues that *812 the chancellor erred in denying her motion for modification and erred in enjoining her attorney from communicating with her regarding the final judgment.

Procedural History

¶ 8. Father and Mother were married on December 19, 1980. They were divorced in June of 1999. They had three children. At the time of the hearing, A.D.P. (a daughter) was twenty-one and attending college in another state, E.C.P. (a daughter) was fourteen, and R.R.P. (a son) was twelve.
¶ 4. In the divorce, Father and Mother were granted joint legal custody of all three children. Mother was granted primary physical custody of all three children. In April of 2000, they executed an agreed judgment, and Father was granted sole physical custody of A.D.P.
¶ 5. In June of 2002, Mother, along with E.C.P. and R.R.P., moved from Meridian, Mississippi to Atlanta, Georgia. Father, along with A.D.P., remained in Meridian, Mississippi. The details of the move and the facts relevant to this appeal will be further developed below.
¶ 6. On May 22, 2002, prior to the move, Father filed a motion for modification. He alleged that a material change of circumstances had occurred which adversely affected the minor children, E.C.P. and R.R.P. The motion claimed that the move to Atlanta would negatively affect his visitation, his obligation to provide health insurance and automobile liability insurance, among other allegations.
¶ 7. The motion for modification was set for hearing on June 27, 2002. However, Mother filed a motion for continuance requesting that the matter be reset for August 20, 2002.
¶ 8. On July 29, 2002, Mother filed her response along with a counter-motion for contempt. Mother alleged that Father had violated the provision of the property settlement agreement entitled “Fostering Healthy Relationships,” stating that Father routinely failed to cooperate with Mother to advance the children’s best interests and attempted to influence the children to live with him.
¶ 9. On August 12, 2002, Father filed his response to the contempt motion and stated that Mother influenced, harassed, begged, and pleaded with the children to agree to move with her to Atlanta. Father further alleged that Mother encouraged the children to deceive him in order to prevent him from having visitation.
¶ 10. On August 22, 2002, the chancellor entered an agreed order setting the hearing for September 10, 2002. On August 30, 2002, the chancellor entered an agreed order resetting the hearing and modifying visitation. The order modified Father’s visitation with the children, addressed transportation of the children for visitation, and specified certain dates for Father to have visitation. The parties also agreed to participate in family counseling and to schedule the matter for review or trial in January of 2003, with all issues raised by either party not resolved by the agreement to be protected and raised at the final hearing.
¶ 11. On December 4, 2002, Father amended his motion for modification. He asserted that E.C.P. and R.R.P. were both twelve years of age and expressed a desire to live with Father. Father had previously been awarded sole physical custody of A.D.P. and now requested sole physical custody of E.C.P. and R.R.P. or, in the alternative, that Mother be solely responsible for transportation of the children for visitation with Father. On December 10, 2002, Mother filed her response and a counter-motion for contempt, alleging that Father was in contempt of court and was not entitled to seek modification.
*813 ¶ 12. On December 12, 2002, Father filed a motion for temporary relief and requested that the chancellor grant him temporary custody of E.C.P. and R.R.P. On December 23, 2002, the chancellor entered an agreed order setting the hearing for February 19, 20, and 21, 2003.
¶ 13. On January 6, 2003, Lawrence Primeaux, as attorney for and next friend of E.C.P., filed a petition for change of custody. The petition alleged that a material change in circumstances had occurred which adversely affected E.C.P. The motion included allegations of physical conflicts and conditions in Mother’s home, E.C.P.’s poor performance in school, E.C.P.’s expulsion from school, and criminal charges filed against E.C.P. The petition included a handwritten statement by E.C.P., in which E.C.P. stated her preference to live with Father and that she refused to return to Mother’s custody following Christmas visitation -with Father.
¶ 14. Also, on January 6, 2003, Mother filed a motion for contempt that asked the court to hold Father in contempt for refusing to return E.C.P. following his Christmas visitation. Father filed his answer and joinder on January 7, 2003, joining E.C.P.’s petition and supporting her request to remain in his custody. On January 8, 2003, Mother filed an amended motion for contempt and emergency relief for issuance of writ of habeas corpus or other appropriate relief. On January 14, 2003, Father filed his response.
¶ 15. On January 24, 2003, Mother filed a motion to disqualify Lawrence Primeaux as attorney and next friend of E.C.P.
¶ 16. A hearing was held before the Honorable Sarah Springer, Lauderdale County Chancellor, on February 19, 20, and 21, 2003. At the end of the day on February 21, the chancellor continued the hearing to June 10, 11 and 12, 2003, and she issued a bench opinion that required E.C.P. to return with her Mother to Atlanta.
¶ 17. On March 4, 2003, Mother filed her answer to E.C.P.’s petition for change of custody, wherein she denied that there was a material change in circumstances adversely affecting E.C.P. and requested that E.C.P.’s petition be denied.
¶ 18. The hearing was concluded on June 10,11, and 12, 2003. On July 9, 2003, the chancellor issued a memorandum opinion. On November 6, 2003, the chancellor issued her ruling on the award of attorney’s fees. In essence, the chancellor denied the requests to modify custody, found Father in contempt, and ordered Father to pay Mother $35,000 in attorney’s fees. The chancellor also enjoined Mr. Pri-meaux, as E.C.P.’s attorney, from discussing with her the outcome of the final judgment.
¶ 19. Both Father and E.C.P. have appealed. The cases were consolidated on appeal.
¶ 20. Subsequent to the appeal, the chancellor entered an agreed judgment, on February 22, 2005, that removed the previous injunction on Mr. Primeaux and allowed him to discuss with E.C.P. the present state of litigation.
¶ 21. On February 25, 2005, Mother filed a motion to dismiss E.C.P.’s appellate brief. Attached to the motion is an undated letter written by E.C.P, which states the following:
To Whom It May Concern:
Please let it be know [sic] that I no longer want to live with my father. It is my choice to live in Atlanta with my mother until I graduate from high school. I withdraw from the custody trial.
Also, I do not want to be forced to visit my father every other weekend. The *814 trip takes too much time out of my schedule, and I’m not able to participate in the activities that I want to. Once a month, over holidays and the summer is often enough.
I love both of my parents, and want to have a good relationship with both of them. I do not want to be in the middle.
¶ 22. On March 2, 2005, Mr. Primeaux, as attorney for and next friend of E.C.P., filed a response to the motion to dismiss, along with a motion to appoint a guardian ad litem.
¶ 23. On February 28, 2005, Father filed a verified complaint for relief, pursuant to Mississippi Rule of Civil Procedure 65(b), wherein he requested that the chancellor enter a temporary order finding that E.C.P. should be delivered to a facility capable of meeting her necessary physical and mental health needs. Also, on February 28, 2005, Mr. Primeaux filed a motion for appointment of guardian ad litem.
¶ 24. A hearing was held on March 7, 2005, where E.C.P. was placed in an intensive in-patient treatment program and ordered to remain there for at least thirty days. We have no information of the outcome of this treatment.

Facts Relevant to Appeal

¶ 25. Following the divorce in 1999, the children lived with Mother in Meridian. The record indicates that both E.C.P. and R.R.P. were happy living in Meridian. They continued to receive good grades at school. Father testified that R.R.P. made A’s and B’s throughout his time in Meridian. Father eventually remarried and testified that the children’s relationship with his new wife was good.
¶ 26. In June 2002, Mother, along with E.C.P and R.R.P., moved from Meridian, Mississippi to Atlanta, Georgia. Mother never discussed the move with Father. Instead, Father learned of the move from a colleague.
¶ 27. Prior to the move, Mother led the children to believe that Atlanta would provide them better opportunities. E.C.P. testified that her Mother pressured her to move to Atlanta. Specifically, E.C.P. stated,
[Mother] told me how wonderful [Atlanta] would be. How many new opportunities I would have. How the schools are better. That if I lived [in Meridian] I wouldn’t go anywhere. And she said that I would have — I would have fun. There would be things to do. There is amusement parks, bigger malls.
E.C.P. stated that as a result of her Mother’s encouragement, she got excited about the move and thought it would be “really cool to be able to go to Six Flags and do fun things like that.”
¶ 28. Although Mother claimed the move was to “advance her career opportunities and enable her children to have more cultural and educational opportunities,” the chancellor determined that Mother’s real motivation behind the move was to distance herself and the children from Father. Prior to the move to Atlanta, Father was able to see the children on a regular basis without disrupting their schedules. However, after the move, Father was unable to exercise his weekend visitations due to the distance and the children’s involvement in extracurricular activities.
¶ 29. Following the move to Atlanta, both E.C.P. and R.R.P.’s grades dropped significantly. R.R.P., who received A’s and B’s in Meridian, received D’s and F’s during his first semester in Atlanta.
¶ 30. E.C.P. began to misbehave. She experimented with illegal drugs, both marijuana and cocaine, and was expelled from school after school officials found a knife in *815 her locker. E.C.P. and her Mother often argued. E.C.P. testified that the arguments started “maybe a month after we moved [to Atlanta] or at least as soon as school started.” During the arguments, Mother and E.C.P. would call each other names such as “b* * *h” and “wh* *e.” During one of the arguments, Mother slapped E.C.P. and ordered her out of the house, barefoot in 45 degree weather. E.C.P. was eventually picked up by the police about three miles away from home and brought back to Mother.
¶ 31. In December 2002, following Christmas visitation with Father, E.C.P refused to return home to her Mother in Atlanta. E.C.P. testified that she wanted to live in Meridian with her Father. She stated that she gave Atlanta a “fair chance” but realized how much she missed Meridian and all of her friends. E.C.P. further testified that she discussed with Mother her desire to live with Father. When asked how her Mother responded, E.C.P. stated, “[Mother] said that she didn’t want to have anything to do with me. She didn’t want me to come and visit. That she-you know, she said if I come to live in Meridian she doesn’t even want me to work out a visitation schedule because she wouldn’t want to visit me.”
¶32. E.C.P filed a petition to modify custody alleging that there had been a material change in circumstances to warrant a change in custody and that because she was of statutory age, her preference to live with her father should be granted. After January 6, E.C.P. remained with her Father through the first hearing in February of 2003. During this time, there was testimony that she had again experimented with marijuana. After the final day of the hearing in February, the chancellor ordered E.C.P. to return to Atlanta with Mother, and she did.

Standard of Review

¶ 33. This Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or applied an erroneous legal standard. Sanderson v. Sanderson, 824 So.2d 623, 625-26(¶ 8) (Miss.2002).

Analysis

I. Did the chancellor err in holding Father in contempt?

¶ 34. The chancellor’s judgment found Father in contempt for two issues:
18. The Court finds that [Father] is in contempt of court for his flagrant violations of paragraph 7.4 of the Property Settlement Agreement made part of the Judgment of Divorce.
19. [Father] is also in contempt of court for aiding and supporting [E.C.P.] in her decision not to return to her mother’s custody after the Christmas holidays.
We will discuss each of these separately.

A. Property Settlement Agreement, Paragraph 74-, Fostering Healthy Relationships.

¶35. Paragraph 7.4 of the Property Settlement Agreement, titled “Fostering Healthy Relationships,” states:
The parties shall cooperate with respect to the children to advance the children’s health, emotional and physical well-being and sense of security. Neither party shall directly or indirectly influence the children so as to prejudice the children against the other parent. The parents will endeavor to guide the children to promote an affectionate relationship between the children and the other party. They agree not to communicate through the children and they agree not *816 to ask the children probing questions about the other party. The parties agree the children should not be ‘placed in the middle’ between them and their disputes. Neither party will interfere with the rules or disciplinary actions established by the other for the children. The parties will cooperate with each other in carrying out the provision of this agreement for the child’s best interest.
¶ 36. Mother’s contempt petition alleges that Father’s conduct constitutes a breach of this contractual provision.[1] The chancellor, in her memorandum opinion, acknowledged that “this provision ... is something that all parents should strive for, and unfortunately, neither parent has been able to fully comply with Paragraph 7.4 of their property settlement agreement.” We recognize that the conduct required by this language does not apply to these parties simply because it was included as a provision of their property settlement agreement. Indeed, this provision simply describes proper conduct that is expected of all divorced parents. This language, albeit reduced to writing in the parties’ Property Settlement Agreement, imposed no additional duties, responsibilities and obligations on the parties to this action than those that are implied by common courtesy, decency, good faith, and fair dealing in all divorce actions. Indeed, all divorced parents, under the jurisdiction of courts in the State of Mississippi, regardless of whether such language is included in a property settlement agreement or judgment of divorce, are required to comply with the conduct discussed in Paragraph 7.4.
¶ 87. In her brief, Mother emphasizes the following sentences: “Neither party shall directly or indirectly influence the children so as to prejudice the children against the other parent;” and “The parties agree the children should not' be ‘placed in the middle’ between them and their disputes.” Mother asserts that Father violated this provision by involving the children in things they should not have been involved in. She claims that in April of 2002, Father “insisted in letting the children know how they, the children, would break his heart with their move to Atlanta.” She points to a conversation[2] between Father and R.R.P., where the following was said:
Father: You going to stick with me on this?
R.R.P.: (No response).
Father: Huh?
R.R.P.: What do you mean “stick with” you?
Father: I mean, are you going to stay with Daddy or [sic] you going to leave Daddy?
R.R.P.: Huh?
Father: You’re not going to leave Daddy, are you?
R.R.P.: Daddy?
Father: Yeah. (Male in background talking)
R.R.P.: I want to try it first and see how it is, and I can’t do anything right now because I’m 11. I’ll do it when I’m 12.
*817 Father: What if the Judge said you could do it? We could try and do it now.
R.R.P.: Uhm, Dad.
Father: Yeah.
R.R.P.: I want to try it first. Okay?
You never know until you try.
Father: You’re going to break my heart now.
R.R.P.: Dad (starts crying) — okay, I’ll stay with you.
Father: I tell you what, let’s you and I talk about it this weekend when you’re over here.
R.R.P.: Okay (Crying).
Father: Okay?
R.R.P.: Okay (Crying).
Father: I love you. You know that.
R.R.P.: I love you too (Crying).
¶ 38. Father acknowledged that some of his comments in this conversation were inappropriate. He argues that the comment “you are breaking my heart” is inappropriate but not contemptuous. He explained that he had these conversations so that the children would have a realistic picture of the implications and potential consequences of the move.
¶ 39., He also points to Section 7.6 of the Property Settlement Agreement, titled “Cooperation,” which provides:
The parties recognize that it is in the best interests of the children that they cooperate with each other. Neither parent shall unreasonably schedule religious, school, or social activities for the children which unreasonably interfere with the other’s right to physical custody.
Father claims that Mother’s conduct also violated both Sections 7.4 and 7.6.
¶ 40. The primary issue that began this dispute was Mother’s decision to move the children to Atlanta. Certainly, she had a right to move to Atlanta. See, e.g., Spain v. Holland, 488 So.2d 318 (Miss.1986) (divorced custodial parent had right to move and relocate the child incident to pursuit of reasonable professional or economic opportunity). However, both Mother and the chancellor ignore Mother’s actions leading up to the move. Instead, Mother claims that Father should be held in contempt because he directly or indirectly influenced the children so as to prejudice the children against her, and he placed the children in the middle between them and their disputes. Mother argues that he should have helped his children with the transition and supported Mother in her decision.
¶ 41. Naturally, Father presented reasons and arguments against Mother moving the children to Atlanta. For their entire lives, the children had lived in Meridian and called it home. The visitation provision, in their Property Settlement Agreement, was based on the fact that they all lived in the same geographic location. ■
¶42. Father discovered the Mother’s plan to move, not from Mother but, from a colleague at his place of work. He subsequently learned that Mother had discussed the advantages of the move with the children and convinced’them how the move would benefit them. She told E.C.P. and R.R.P. of the wonderful opportunities that would be available to them in the Atlanta area. In fact, prior to the move and prior to Father learning of the move, Mother arranged for both E.C.P. and R.R.P. to attend, sessions with Jean Merrill, a psychologist. The purpose of the sessions was to assist the children with the move. Father claims that Mother, likewise, improperly influenced the children by telling them the glowing benefits of the Atlanta area, without giving them the full picture of the consequences of the move and informing them of the real effect that the *818 move would have on the relationship with their father.
¶ 43. In the memorandum opinion, the chancellor made the following findings of fact Rnd conclusions of law on this issue:
The proof before this Court is uncontro-verted that in early summer 2002 [Mother] moved [E.C.P.] and [R.R.P.] with her to the Atlanta, Georgia area. This caused considerable conflict between the parents with regard to visitation issues as [Father] was zealous in his protection of his rights to see his children. Unfortunately, in the process of ensuring that he had adequate time with his children, the children were exposed to the conflict between the parents....
A review of the conversations transcribed in Exhibit 16 does show that there was considerable involvement of the children in the disputes between [Mother] and [Father], [Father] said many things to the children which were inappropriate and which put pressure on the children with regard to their visits with him.
The telephone conversations were recorded by [Mother] because of her belief, which was shown to be true, that [Father] was manipulating the children. It should be noted that in conversations which include [Mother]’s comments and expressions, she was fully aware that her words were being recorded for potential use in the Court action, while [Father] was not.
[Mother] began taping conversations between the children and their, father prior to the move to Atlanta. She became concerned about the things the children were telling her about these conversations, and she testified that the taping was [E.C.P.]’s idea. This shows there was a conversation between [Mother] and [E.C.P.] concerning [FatherJ’s conduct, which was a violation of paragraph . 7.A Of course, [Mother] would have had an almost impossible task of proving [Father]’s adverse influence on the children had it not been for the taping of the conversations....
Despite the parents’ provision in their own property settlement agreement, these children have been deeply involved in the disputes between their parents. This situation is damaging the children and must stop....
In his testimony, [Father] described [Mother’s decision to move to Atlanta as unilateral and benefiting [Mother] only and stated it was detrimental to the children and detrimental to his visitation with the children. He also accused [Mother] of being interested in distancing the children from him. [Father] described that he was angry, hurt, and frustrated from being excluded from the plans to move to Atlanta. He stated that when he talked to [Mother] about the visitation and problems he had with her move to Atlanta, she was cryptic, vague and deceptive.
[Father] described the message that [Mother] was giving to the children about Atlanta as “it would be a fantastic, wonderful place. They would have a season pass to Six Flags, the neighborhood would be full of children, there would be lots of opportunities, more personal space,- a community pool, and private bathrooms in the home.” He characterized [Mother’s discussions of the move with the children as brainwashing them to anticipate and enjoy the move and she was not giving them the full picture of the implications of the move especially as it related to their continuing contact with him.
[Father] testified that he wanted the children to have a realistic picture of the implication of the move and admitted trying to get 11 year old [R.R.P.] to *819 oppose the move to Atlanta: Knowing that [E.C.P.] expressed a strong desire to go to Atlanta, he tried to convince her to stay in Meridian. [Father] felt that [E.C.P.] had been coerced and brainwashed by her mother.- He didn’t tell [E.C.P.] that her mother had lied to her and told 11 year old [R.R.P.], “your mom is trying to keep you from me.”
[Father] and [Mother] have joint legal custody of the children. Certainly [Father] should have been fully informed about [Mother’s flans to move to Atlanta, and any opposition [Father] had to the move should have been worked out between [Mother] and [Father], [Mother] made up her mind to move, and nothing [Father] said to her once he found out about her intentions served to change her mind. Nevertheless, [Father] should never have involved the children in opposing their mother’s decision to move to Atlanta. Knowing that [Mother’s mind was made up and the move was inevitable, he should have helped his children with the transition and supported their mother in the decision that she made, even though he was opposed to it.
[Mother] is the children’s custodial parent. She made a decision to move to the Atlanta area which is her right. Any parent who is moving children to another area would encourage the children to be excited about the move and this is not “brainwashing.”
[FatherJ’s attitude about [Mother’s move affected his interaction with the children and he did not make any attempt to support [Mother] in her decision to move when it came to his interaction with the children. In fact, his conversations in Exhibit 16 show that he did all he could to put a negative spin on the move....
[Mother] admitted that she did not discuss the move ivith [Father] prior to the time that the plans were consummated and also asserted that she did not encourage the children to hide the move from their father.
Certainly, in considering both [Mother] and [Father] and their history, the Court is of the opinion that part of the motivation for [Mother’s move may have been to distance the children from their father ....
The Court does find that [Father] is guilty of manipulating the children. [Mother’s discussions with the children concerning the benefits of moving to Atlanta would be necessary for any parent moving children away from a longtime home and the Court does not consider the excitement about the move to Atlanta and her description of the benefits of the move to Atlanta to her children to be inappropriate ....
(Emphasis added).
¶ 44. Our standard of review for contempt matters is well settled. “Contempt matters are committed to the substantial discretion of the trial court which, by institutional circumstance and both temporal and visual proximity, is infinitely more competent to decide the matter than we are.” Ellis v. Ellis, 840 So.2d 806, 811(¶ 16) (Miss.Ct.App.2003) (citing Varner v. Varner, 666 So.2d 493, 496 (Miss.1995)). If an order of the court was ignored, then the finding of contempt is proper. Id. This Court will not reverse a contempt citation where the chancellor’s findings are supported by substantial evidence. Id. Here, we find the chancellor’s finding of contempt, as to this issue, to be manifestly wrong and clearly erroneous.
¶ 45. The chancellor’s decision contains a contradiction. In one paragraph, she finds, that the parents share “joint legal custody” and in the next she *820 finds that Mother is “the children’s custodial parent.” The chancellor, therefore, concludes that since Mother has sole physical custody then her decision to move is final, and her exclusion of Father from the discussion and decision-making process is permissible. We disagree. There is important legal significance in the order that granted Father “joint legal custody.” This may not be overlooked.
¶ 46. The record reveals that Mother and Father share joint “legal custody,” and Mother has sole “physical custody.” These terms are defined by statute in Section 93-5-24 of the Mississippi Code Annotated. “Joint legal custody” means that:
the parents or parties must share the decision-making rights, the responsibilities and the authority relating to the health, education and welfare of a child. An award of joint legal custody obligates the parties to exchange information concerning the health, education and welfare of the minor child, and to confer with one another in the exercise of decision-making rights, responsibilities and authority.
Miss.Code Ann. § 93-5-24(5)(e) (Rev.2004) (emphasis added). The chancellor acknowledged that the Mother’s .actions deprived Father of his opportunity to participate in the discussions about the move to Atlanta. As a result, this finding can only lead to the conclusion that Mother clearly violated her “obligation to exchange information” about the children’s education and welfare and to allow Father to “share in the decision-making rights.”
¶ 47. Mother testified that one of the reasons to 'move to Atlanta was for the educational opportunities that it afforded the children. Certainly, the relocation of the children would affect their “welfare.” Because he had joint legal custody of both E.C.P. and R.R.P., Father was entitled to share in the “decision-making rights, the responsibilities and the authority relating to the ... education and welfare ...” of both E.C.P. and R.R.P. As a joint legal custodian of the children, Father had a right to be involved in and to have an opportunity to discuss the benefits and consequences of the relocation.[3] The fact that Mother kept Father out of the discussions, by her conscious design and plan, should not prevent the children’s father from sharing his opinions, thoughts and concerns' about matters that affect their education and welfare.
¶ 48. Based on the fact that Father was the joint legal custodian of the children and that Sections 7.4 and 7.6 of the Property Settlement Agreement required the parties to “foster healthy relationships” and to cooperate, we find that the chancellor was manifestly wrong and *821 clearly erroneous in her conclusion that Father violated Paragraph 7.4 of the Property Settlement Agreement and that he should be held in contempt. While we agree that the Father’s conversation may have been inappropriate, we cannot find that he is in contempt for doing something that he has a statutory right to do. The chancellor was in error to overlook or ignore the fact that Mother intentionally deprived Father of his statutory and contractual rights to share in the decisions that related to E.C.P.’s and R.R.P.’s education and welfare and then to allow her to use these very same statutory and contractual rights to hold Father in contempt. Hence, we cannot find a basis upon which to sustain the chancellor’s determination that Father’s conversations with E.C.P and R.R.P. were either flagrant or contemptuous.
¶ 49. For these reasons, we reverse and render the chancellor’s finding that Father was in contempt for violating Section 7.4 of the Property Settlement Agreement.

B. Aiding and supporting E.C.P. in her decision not to return to her mother’s custody after the Christmas holidays.

¶ 50. The chancellor also found Father in contempt for conspiring and assisting E.C.P in not returning to her Mother’s after Christmas. Father argues that there is no evidence of such conspiracy and contends that E.C.P.’s decision not to return to Mother’s was solely her idea.
¶ 51. The chancellor found that:
It is obvious from the proof before the Court that this was a plan of action that commenced in November 2002, and [Mother] was not made aware of it until January 5th, 2003, when she was on her way to pick up [E.C.P.] and [R.R.P.] after their Christmas holiday with their father.
[E.C.P.] should not have been placed in a position that she was encouraged and supported in her disobedience to her mother. [Father’s conduct in fostering this attitude in this child and supporting this position of his child even to the extend of hiring her a separate attorney does constitute contempt of this Court.
¶ 52. To make this finding, the chancellor relied on letters written in December of 2002 by Father and Dr. Ken Schneider to the Meridian School District and the Lauderdale County School District stating that E.C.P would be enrolling in school in Meridian as soon as January of 2003.
¶ 53. As discussed in the procedural history, several motions for modification had been on file since mid-year in 2002. The December 30, 2002 agreed order setting the case for trial clearly states that the “temporary hearing scheduled for January 6, 2003 is continued.” Father argues that he anticipated that the custody of E.C.P. would be litigated, during the January 6 hearing, and that he needed to testify as to what arrangements had been made concerning his educational plans for the children if the court decided to change custody at the January 6 hearing. He argues that he had reasonable confidence that the modification would be granted because both E.C.P. and R.R.P. had expressed their preference to live with him and due to E.C.P.’s behavioral difficulties while she lived in Atlanta. The language of the letters is consistent with Father’s expectation that the children’s preference would be granted by the chancellor.
¶ 54. E.C.P. testified that she first told her father of her preference to live with him during his Thanksgiving visitation in 2002. E.C.P. arrived for her Christmas visitation on December 26, 2002. Both E.C.P. and Father testified that on January 5, E.C.P. announced that she was not *822 going to return to Atlanta, and she planned to stay and live with her father. Father contacted Mother and revealed E.C.P.’s announcement. Father also testified that he understood that she must return to Mother but that he could not get E.C.P. to get in the car to return to her mother. Father took E.C.P., and met Mother, at the Meridian Police Department to enlist the assistance of law enforcement. The police officers apparently explained that E.C.P. should return with her Mother or that she could face placement in juvenile detention. Father enlisted the assistance of an attorney, Mr. Pri-meaux, to counsel with and assist E.C.P. and Dr. Schneider. Mr. Primeaux’s counsel appeared necessary due to the concern that E.C.P.’s decision could result in her immediate incarceration in juvenile detention. On January 6, 2003, Mr. Primeaux filed pleadings on behalf of E.C.P. The chancellor allowed Mr. Primeaux to participate in the hearing as E.C.P.’s counsel.
¶ 55. We find that there is simply no evidence to support the chancellor’s finding. Indeed, there is no direct or indirect evidence that Father knew of or had any part in E.C.P.’s refusal to return to Mother’s custody. Instead, the evidence indicated that Father sought the aid, services and support of law enforcement, an attorney and a psychologist to try to get E.C.P. to comply with the court’s order. There is no evidence that would infer that Father did anything other than attempt to comply with the court’s decree on visitation. Clearly, the chancellor’s opinion and ultimate finding is based on the fact that she considered E.C.P. to be an independent, strong willed and rebellious teenager who was misbehaving. There is no evidence to support a finding that Father encouraged or advanced E.C.P.’s announcement that she wanted to stay with her Father.
¶ 56. We find that there is insufficient evidence to support a finding that Father is responsible for or should be held in contempt for conspiring and assisting E.C.P in not returning to Mother’s after Christmas. Accordingly, we reverse and render the chancellor’s finding of contempt on this issue.

C. Contempt punishment.

¶ 57. As a remedy or punishment for the contempt, the chancellor ordered that Father be required to participate in and pay for counseling. If he failed to comply, the chancellor stated that she would enforce this sanction by incarcerating Father. We must state that we too believe that this family, like many others going through the same situation, would benefit from professional counseling to assist them with the issues that they face. However, because we have reversed and rendered the chancellor’s findings of contempt, we must also reverse and render the sanctions contained in paragraphs 9 through 14 of the chancellor’s judgment.

II. Did the chancellor err in denying Father’s motion for modification of custody?

¶ 58. The standard for appellate review of modification actions and the elements necessary to establish a modification were summarized in Mabus v. Mabus, 847 So.2d 815, 818(¶ 8) (Miss.2003), where Justice Carlson wrote:
In a case disputing child custody, the chancellor’s findings will not be reversed unless manifestly wrong, clearly erroneous, or the proper legal standard was not applied. Hensarling v. Hensarling, 824 So.2d 583, 587 (Miss.2002). See also Wright v. Stanley, 700 So.2d 274, 280 (Miss.1997); Williams v. Williams, 656 So.2d 325, 330 (Miss.1995). The burden of proof is on the movant to show by a *823 preponderance of the evidence that a material change in circumstances has occurred in the custodial home. Riley v. Doerner, 677 So.2d 740, 743 (Miss.1996). In the ordinary modification proceeding, the non-custodial party must prove: (1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child’s welfare; and (3) that the child’s best interests mandate a change of custody. Bubac v. Boston, 600 So.2d 951, 955 (Miss.1992).
In considering whether there has been such a change in circumstances, the totality of the circumstances should be considered. (Spain v. Holland, 483 So.2d 318, 320 (Miss.1986)). Even though under the totality of the circumstances a change has occurred, the court must separately and affirmatively determine that this change is one which adversely affects the children. Id. Bredemeier v. Jackson, 689 So.2d 770, 775 (Miss.1997). Furthermore, it is well settled that the polestar consideration in any child custody matter is the best interest and welfare of the child. Al-bright v. Albright, 437 So.2d 1003, 1005 (Miss.1983).
¶ 59. Here, as is often done by chancellor’s in modification decisions, the chancellor did not- separate her findings of fact and- conclusions of law in a three step analysis. Instead, the chancellor found, “[biased on all of the evidence reviewed by this Court, it is clear that [Father] has failed to show that there is a material and substantial change of circumstances adversely affecting the minor children such that their best interest would be served by their placement in his custody.” Hence, the chancellor’s opinion does not allow us to determine which step(s) of the three step analysis Father failed to prove. Accordingly, we will review whether the chancellor committed manifest error or was clearly erroneous in failing to find (1) that there was a substantial or material change in circumstances, (2) that this change adversely affected the child, and (3) that a modification was in the best interests of the child.

A. Substantial or material change of circumstances.

¶ 60. Father argues that the chancellor erred in denying his motion for modification of custody. Father cites to E.C.P.’s behavior as proof of a material and substantial change in circumstances that has adversely affected her. He claims that since moving with Mother to Atlanta, E.C.P. has experimented with drugs (marijuana and cocaine), has run away from home on two separate occasions, and was expelled from school. He also argues that since the move both E.C.P. and R.R.P. have obtained poor grades in school.
¶ 61. In Spain, the supreme court held that a divorced custodial parent had the right to move and relocate the children in order to pursue a reasonable professional of economic opportunity. Spain, 483 So.2d at 320. The court recognized that the chancellor had determined that a move out of the country was indeed a material change of circumstances. However, the supreme court’s finding was based on its conclusion that the chancellor was correct in finding that there was no adverse effect on the children. Id. The court held:
We need be clear what we mean by the phrase “adverse effect”. These children have already been adversely affected by the inability of their mother and father to live together which led to the 1983 divorce. Beyond this, most children of divorced parents will be further adversely affected if the two parents are living *824 in the same town at the time of the divorce and either subsequently moves thousands of miles away. Where such occurs we solve nothing by shifting custody to the parent staying at home for, in theory at least, a transcontinental separation from either parent will adversely affect the child. The judicial eye in such cases searches for adverse effects beyond those created (a) by the divorce and (b) by the geographical separation from one parent.
Id. at 320-21. From this, we are of the opinion that the Mother’s move to Atlanta was indeed a material or substantial change of circumstances.
¶ 62. In addition, Father contends that the chancellor failed to consider E.C.P.’s preference to live with him. Mississippi Code Annotated Section 93-11-65 (Rev.2004) allows a child who has attained the age of 12 to state her preference to the court as to whether she would rather live with her mother or father. However, the trial court is not bound to follow the child’s preference. See Polk v. Polk, 589 So.2d 123 (Miss.1991). Furthermore, we have found no authority to support a conclusion that a child’s statement, in and of itself, of his or her preference to live with the noncustodial parent would rise to the level of a material or substantial change of circumstances.

B. Adversely affecting the child.

¶ 63. While a move may be considered a material or substantial change of circumstance, the more important determination is whether there was an adverse affect on the child that occurred as a result. On this issue, the evidence is overwhelming, and the chancellor recognized that E.C.P.’s behavior was very disturbing.
¶ 64. Shortly after moving to Atlanta, E.C.P. was expelled from her school for having contraband in her locker. She was sent to an alternative school for the remainder of the semester. -E.C.P also began -to experiment with illegal drugs. She has admitted to trying marijuana and cocaine with her friends in Atlanta. Subsequently, after she returned to Meridian, she also admitted to once using marijuana.
¶ 65. Of more concern, however, E.C.P., Mother, and Dr. Schneider testified about the confrontational and volatile nature of the mother-daughter relationship. The record contains many vulgar curse words, some of which we choose not to reprint, that Mother and daughter used towards each other. E.C.P. has clearly lost respect for her mother. E.C.P., in her testimony, repeatedly referred to Mother by her first name. As a result of their conflicts, E.C.P. twice ran away from her Atlanta home. Fortunately, she was returned unharmed by police.
¶ 66. Based on the overwhelming abundance of this evidence which clearly indicates that the move to Atlanta had an adverse effect on E.C.P., we find that the chancellor was manifestly wrong and clearly erroneous in her decision that the material change‘of circumstances did not adversely affect E.C.P.

C. Best interest of the child.

¶ 67. In Mabus, Justice Carlson again holds that it is “well settled, that the polestar consideration in any child custody matter is the best interest and welfare of the child. Albright v. Albright, 437 So.2d 1003,1005 (Miss.1983).” Mabus, 847 So.2d at 818(118). Our chancellors must fully and thoroughly review the Albright factors to determine the initial custody placement of the children. Often, in modification matters, the review of the first two steps can make the third step almost unnecessary.
*825 ¶ 68. Here, however, the decision of what is in the best interest of the child is unclear. In her memorandum opinion, the chancellor found that:
Placing these children in [Father’s] custody would only serve to show a rebellious 14 year old that she can get her way against her mother and has no need to comply with her mother’s reasonable discipline considering the actions in which this child has engaged. She should not be awarded her desires in this instance.
The chancellor believed that E.C.P.’s misbehavior was simply an act of natural teenage rebellion.
¶ 69. Yet, both the chancellor and this Court have recognized very disturbing behavior by E.C.P. It may well be that her actions were the result of natural teenage rebellion. The proper vehicle by which to arrive at that conclusion is the Albright factors.[4] When considering a modification of child custody, the proper approach is to first identify the specific change in circumstances, and then analyze and apply the Albright factors in light of that change. Thornell v. Thornell, 860 So.2d 1241, 1243(¶ 6) (Miss.Ct.App.2003). Once a material change of circumstances has been found, the chancellor should use the Albright factors to decide which parent should have custody of the child. See Mixon v. Sharp, 853 So.2d 834, 839(¶ 19) (Miss.Ct.App.2003); Sturgis v. Sturgis, 792 So.2d 1020, 1025(¶ 19) (Miss.Ct.App.2001). Because the chancellor failed to identify a specific change in circumstances that adversely affected the child and then do an on the record analysis of each of the Al-bright factors, we are compelled to reverse. See Thomell, 860 So.2d at 1243(¶ 8).
¶ 70. Based on our finding that there was overwhelming evidence to establish that there was a material and substantial change of circumstances that adversely affected the child, we reverse and remand this issue for the chancellor to conduct an Albright hearing and to issue the appropriate findings of fact and conclusions of law.

III. Did the chancellor err in awarding attorney’s fees to Mother?

¶ 71. Generally, the award of attorney’s fees is left to the discretion of the trial court. Cheatham v. Cheatham, 537 So.2d 435, 440 (Miss.1988). Since we have reversed and rendered the chancellor’s finding of contempt and reversed and remanded for further proceedings on the modification, we reverse and remand the award of attorney’s fees for further consideration of the chancellor consistent with the findings of this Court.

TV. Did the chancellor err in failing to hold Mother in contempt?

¶ 72. Father asserts that the chancellor erred in fading to hold Mother in contempt. He claims that Mother violated Section 7.6 of the property settlement agreement. Father relies on telephone conversations between himself and the children, which were recorded by Mother without his knowledge. The chancellor found that since Mother testified that the taping was E.C.P.’s ■ idea, “[t]his shows there was a conversation between Mother and E.C.P. concerning Father’s conduct, which was a violation of paragraph 7.4.” However, the chancellor goes on to note that had it not been for the taping of the conversations, “Mother would have had an *826 almost impossible task of proving Father’s adverse influence on the children.”
¶ 73. Father also relies on E.C.P.’s involvement in cheerleading as an example of Mother’s violation of Section 7.6. Father alleges that Mother intentionally scheduled E.C.P. to participate in a cheer-leading group that met every Sunday afternoon, thereby conflicting with his visitation. However, Section 7.6 prohibits only unreasonably scheduled activities that unreasonably interfere with visitation. A teenage girl’s participation in cheerleading is not unreasonable.
¶ 74. Father further relies on the fact that Mother moved to Atlanta without first discussing it with him as evidence of contempt. We have previously discussed this issue. We again conclude that there was evidence to show that Mother’s actions were inappropriate. However, we do not find that her conduct rises to the level of contempt. Therefore, we affirm the chancellor’s finding that Mother was not in contempt of court.

E.C.P.’S Appeal

I. Did the chancellor err in denying E.C.P.’s request for modification of custody?

¶ 75. As we have adequately discussed this issue above, we find no reason to repeat it. We take notice of the letter written to this Court. On remand, the chancellor will have the opportunity to consider it in her determination.

II. Did the chancellor err in enjoining E.C.P.’s counsel from communicating with her regarding the final judgment?

¶ 76. In her memorandum opinion, the chancellor stated the following:
Although [E.C.P.] has her own attorney, hired and paid by her father, the Court is of the opinion that she should not have access to this opinion and should not be allowed to confer with legal counsel about its meanings and implications. The Court is of the opinion that her parents should inform her of the basic ruling of the Court, and that she should not be allowed to review the Court’s ruling.
The Court had an on-the-record conference with the attorney’s [sic] in this action on June 25, 2003. The Court is hesitant to interfere with the relationship between a litigant and her lawyer, but as this child’s greater guardian, the Court must act in her best interest. Therefore, attorney Larry Primeaux is ordered and directed that he is not to confer in any way, form or manner with [E.C.P.] concerning this or related litigation without the express written permission of both [Mother] and [Father].
¶ 77. At the beginning of the trial in this matter, Mother objected to E.C.P.’s involvement in the litigation and asked that she be dismissed as a party. The chancellor overruled Mother’s objection and also overruled Mother’s request that E.C.P.’s petition for change of custody be dismissed. As a result, E.C.P participated as a party in this matter through her counsel, Mr. Primeaux.
¶ 78. There is no discussion in the briefs that the chancellor erred in allowing Mr. Primeaux to participate in the hearing. Indeed, Mother’s brief does not address the substance of this issue, and she cites no legal authority. Mother simply attacks this issue on the ground that Mr. Pri-meaux violated the chancellor’s order by filing the brief.
¶ 79. E.C.P. cites Article 3, Section 25 of the Mississippi Constitution, which states that “[n]o person shall be debarred from prosecuting or defending *827 any civil cause for or against him or herself, before any tribunal in the state, by him or herself, or counsel, or both.” The chancellor’s order enjoining E.C.P.’s counsel from discussing with her the final outcome of the trial effectively prevented E.C.P. from further prosecuting the civil action brought by her through counsel. Further, the chancellor’s action denied E.C.P. access to legal advice from the attorney who represented her throughout the trial. If the chancellor believed that E.C.P. was not properly before the court as a party, or felt that it was inappropriate for E.C.P. to continue as a party, she could have granted the motion to dismiss or appointed a guardian ad litem. Likewise, Mother could have appealed from this ruling but she did not. Accordingly, the issue of whether a child may be a party in or commence a modification proceeding is not before us.
¶ 80. The February 22, 2005 agreed order removed the previous injunction on Mr. Primeaux and allowed him to discuss with E.C.P. the present state of litigation. Therefore, we find this issue moot.
¶ 81. We must, however, add that this would have been a valuable opportunity for the chancellor to appoint a guardian ad litem for E.C.P. and tax all costs to the parties. Unfortunately, the record has many references which indicate that Mother, and at times the chancellor, believed Mr. Primeaux was simply another attorney working for Father. Here, the parties had the funds necessary to hire an independent guardian ad litem. We do not believe it is necessary or appropriate for a child to be represented by counsel in a domestic matter. The interests of the child could be more adequately and effectively protected through the appointment of an independent guardian ad litem.
¶ 82. Since the appeal, we recognize that additional proceedings have occurred. On February 28, 2005, Father filed a verified complaint for relief where he asked the chancellor to enter a temporary order finding that E.C.P. should be delivered to a facility capable of meeting her necessary physical and mental health needs. On the same date, Mr. Primeaux filed a motion for appointment of guardian ad litem.
¶83. We.are also advised that a hearing was held on March 7, 2005, where E.C.P. was ordéred to be placed in an intensive in-patient treatment program and to remain fqr at least thirty days. We have no information of the outcome of this treatment.
¶ 84. On remand, we encourage that the chancellor appoint an independent guardian ad litem to represent the interests of E.C.P.
¶ 85. THE JUDGMENT OF THE CHANCERY COURT OF LAUDER-DALE COUNTY FINDING FATHER IN CONTEMPT OF COURT IS REVERSED AND RENDERED. THE JUDGMENT FAILING TO FIND MOTHER IN CONTEMPT OF COURT IS AFFIRMED. THE JUDGMENT AWARDING ATTORNEY’S FEES TO MOTHER IS REVERSED AND REMANDED. THE JUDGMENT DENYING FATHER’S AND E.C.P.’S MOTION FOR MODIFICATION OF CUSTODY IS HEREBY REVERSED AND REMANDED. THE JUDGMENT ENJOINING COUNSEL FOR E.C.P. FROM COMMUNICATING WITH HER REGARDING THE FINAL JUDGMENT IS DETERMINED TO BE MOOT. ALL COSTS OF THIS APPEAL ARE ASSESSED TO APPELLEE.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, CHANDLER, BARNES AND ISHEE, JJ„ CONCUR.

. We note that Mother’s brief does not cite any controlling case law or other legal authority that supports the chancellor's finding that Father was in contempt of court by violating the terms of Paragraph 7.4.

. The conversation was recorded by Mother without the knowledge or consent of Father or R.R.P. In Wright v. Stanley, 700 So.2d 274, 279 (Miss.1997), the supreme court held that there is "no prohibition against a custodial parent recording the conversations of her children in the custodial home.”

. The chancellor recognized the divorce created hard feelings between these parties. This occurs often. The parent with joint legal custody may not be the party that makes a final decision about where the children live, but the parent that does not have physical custody does have, a right to be aware of information that may affect the health, education, and welfare, and he/she has the right to express his/her thoughts, feelings and opinions about the decision that is to be made.
Here, Mother could have avoided the need to surreptitiously record conversations between Father and the children or be concerned about Father having an inappropriate conversation that may manipulate the children if she had only first attempted to honor the provisions of Section 7.4 and 7.6 of the Property Settlement Agreement and discussed the potential for a move with Father. Mother could have attempted to work through a joint discussion with the children that allows both Mother and Father to discuss both the advantages and disadvantages of the move with the children. Mother consciously chose not to include Father and clearly took advantage of the fact that she had sole physical custody of the children. She had a responsibility to allow Father an opportunity to be involved in the decision that was to be made.

. The chancellor's memorandum opinion discussed one of the Albright factors, the preference of the child. E.C.P. testified that she wanted to live with Father. Dr. Schneider testified that R.R.P. expressed his preference to live with Father.