# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00262-COA

**THOMAS CLIFTON JONES**                                                                 **APPELLANT**

**v.**

**SHANDA HOLDER JONES**                                                                   **APPELLEE**

DATE OF JUDGMENT:                       03/24/2016
TRIAL JUDGE:                            HON. D. NEIL HARRIS SR.
COURT FROM WHICH APPEALED:              JACKSON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:                 DIANNE HERMAN ELLIS
ATTORNEY FOR APPELLEE:                  MARK H. WATTS
NATURE OF THE CASE:                     CIVIL - DOMESTIC RELATIONS
DISPOSITION:                            AFFIRMED IN PART, REVERSED AND
                                        RENDERED IN PART, AND REVERSED
                                        AND REMANDED IN PART: 01/31/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**GRIFFIS, C.J., FOR THE COURT:**

¶1.    Thomas Clifton Jones and Shanda Holder Jones were divorced on January 9, 2006. Thomas and Shanda agreed to joint legal custody of their two minor children. Shanda maintains primary physical custody of the children.

¶2.    Pursuant to the parties' property-settlement agreement, Thomas agreed to maintain dependent coverage for health and dental insurance for both children. Thomas and Shanda agreed that "all medical expenses not covered by insurance [would] be equally divided between the parties and/or reimbursed within ten (10) days of submitting invoices for same, including deductible." Thomas and Shanda further agreed to be "equally . . . responsible for

the costs of school[-]related expenses, extracurricular activities[,] and any miscellaneous expenses which may arise."

¶3. Additionally, in the property-settlement agreement, Thomas agreed to pay $682 per month in child support, with the sum of $341 to be paid twice per month. In other words, Thomas agreed to pay $341 twenty-four times per year. A wage-withholding order was subsequently entered but, for unknown reasons, was never issued. As a result, Thomas paid his monthly child support directly to Shanda.

¶4. On May 18, 2009, without a petition filed or process served, a modified wage-withholding order was entered and issued. Pursuant to the modified order, $341 was withheld from Thomas's paycheck on a biweekly basis (i.e., every two weeks). As a result, beginning in 2009, Thomas paid $341 twenty-six times per year.

¶5. On May 13, 2014, Shanda filed a "Complaint for Contempt of Court and Other Relief" and claimed Thomas had failed to pay child support and his portion of the children's medical and school expenses. Shanda sought attorney's fees incurred as a result of Thomas's contempt of court. Thomas subsequently filed his answer along with a counterclaim for contempt and modification of custody. Additionally, Thomas asserted that he had overpaid child support since 2009 as a result of the modified wage-withholding order.

¶6. A three-day trial was held on January 13, 2015, February 16, 2016, and March 11, 2016. On March 24, 2016, the chancellor entered his "Findings of Fact and Conclusions of Law and Final Judgment of the Court" wherein he found Thomas to be in willful and

contumacious contempt of court for his failure to pay child support as well as his portion of expenses. Specifically, the chancellor found Thomas owed $708 in unpaid child support, $5,565.15 in unpaid medical expenses, and $6,946.39 in unpaid school and/or extracurricular expenses, for a total arrearage of $13,219.54.

¶7. The chancellor further found that due to the modified wage-withholding order that was not properly filed or served, Thomas had overpaid child support since 2009.[1] As a result, the chancellor credited Thomas $4,200 against the total arrearage. However, the chancellor denied Thomas's request for credit for the payments his family made on behalf of the children. The chancellor entered a judgment against Thomas in the amount of $9,019.54.

¶8. Additionally, the chancellor awarded Shanda $6,500 in attorney's fees due to Thomas's contempt. The chancellor found no evidence of a material change in circumstances adverse to the minor children and therefore denied Thomas's request for a modification of custody. The chancellor further denied all other requested relief, including Thomas's counterclaim for contempt of court against Shanda.

¶9. Thomas now appeals and argues the chancellor erred in: (1) finding him in contempt for failing to pay his portion of the expenses, (2) finding him in contempt for his failure to pay child support, (3) failing to find Shanda in contempt for her noncompliance with the

---

[1] The chancellor set aside and vacated the modified wage-withholding order and ordered the parties to execute a new order consistent with the property-settlement agreement.

3

property-settlement agreement, and (4) awarding Shanda attorney's fees.

STANDARD OF REVIEW

¶10. "Chancellors are vested with broad discretion, and this Court will not disturb the chancellor's findings unless the court's actions were manifestly wrong, the court abused its discretion, or the court applied an erroneous legal standard." *Johnston v. Parham*, 758 So. 2d 443, 445 (¶4) (Miss. Ct. App. 2000).

ANALYSIS

*I.      Whether the chancellor erred in finding Thomas in contempt for failing to pay his portion of the expenses.*

¶11. "A party can be held in contempt for noncompliance with a judgment issued by the chancellor." *Weeks v. Weeks*, 29 So. 3d 80, 86 (¶23) (Miss. Ct. App. 2009) (citing Mississippi Code Annotated section 9-1-17 (Rev. 2002)). "Failure to comply with a court order is prima facie evidence of contempt." *Evans v. Evans*, 75 So. 3d 1083, 1087 (¶14) (Miss. Ct. App. 2011). "To rebut a prima facie case of contempt, [the non-moving party] must show an inability to pay, that the default was not willful, that the provision violated was ambiguous, or that performance was impossible." *Id*. (citation and internal quotation mark omitted).

¶12. We find the property-settlement agreement, which was drafted by Shanda, to be vague and ambiguous regarding the expenses to be reimbursed. It requires the parties to be "equally . . . responsible for the costs of school[-]related expenses, extracurricular activities[,] and any miscellaneous expenses which may arise." Yet, it fails to define or explain what is meant by

4

such expenses. Thus, under the property-settlement agreement, Shanda contends that any activity in which the children participate is subject to reimbursement. The support for this argument is the fact that the property-settlement agreement not only requires payment for expenses of school and extracurricular activities, but also "miscellaneous" activities. Based on this language, there appears to be no limit to such activities or expenses. Thus, Thomas may be required to pay half of *all* expenses no matter the cost or his ability to pay.

¶13.  Additionally, under the property-settlement agreement, the parties agreed that "all medical expenses not covered by insurance [would] be equally divided between the parties and/or reimbursed within ten (10) days of submitting *invoices* for same, including deductible." (Emphasis added). The property-settlement agreement requires an invoice to be paid or reimbursed within ten days of submission, but it does not place any limitation on the amount of time each party has to submit an invoice. Thus, under this language, a party could wait months or even years to submit various invoices and then demand payment of those invoices within ten days of submission, after the invoices have reached a substantial amount.

¶14.  The property-settlement agreement requires the submission of an "invoice," not an explanation of benefits (EOB). The record shows Thomas received various EOB statements regarding the children's medical appointments and procedures. But an EOB is not an invoice. Although an EOB provides a statement of what insurance has covered, it does not provide proof of who has paid the balance, or whether the balance has been paid.

¶15. According to Thomas, he did not receive bills or invoices for the children's medical expenses and school and/or extracurricular activities until 2014. Thomas's wife, Sherri, also testified that Thomas did not receive any bills prior to March 2014. Sherri explained that in March 2014, she and Thomas picked up the children on a Friday. Shanda handed Thomas a "big huge folder" of unpaid bills and advised that she would need "$5,000 by Sunday or she was taking him to court." Sherri further testified that when Thomas requested bills or receipts, Shanda would respond that she "[d]idn't have them ready."

¶16. Thomas's stepmother, Barbara, testified that she discussed the bills with Shanda on two occasions at Shanda's house. Barbara explained as follows:

> Because [Shanda] would say [Thomas] is not paying me. And I asked her, I said—she—I said why isn't he paying you. And she said I haven't given [the bills] to him. I said why haven't you given them to him? She said I don't want him to be put in jail. He'd lose his job. If I sue him he's going to be put in jail, lose his job and the kids won't have medical insurance. She told me that twice.
>
> Now, in April . . . [Shanda] did not have [the bills] organized. . . . Now come April of that year when [Thomas] was living with us around March/April . . . all of a sudden she demanded that he pay her [$]9,000 now. He was – just got all upset. He said something to Cliff and I about it. Clifton said, and I did too, tell her to turn over the bills. Let's look at them. We need to see the [$]9,000. . . . [Shanda] [n]ever turned them over. And then . . . she filed suit.

¶17. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts § 205 (1981). Thus, in all divorce actions, the parties are obligated to act in good faith and to treat each other with common courtesy and decency. *In re E.C.P.*, 918 So. 2d 809, 816 (¶36) (Miss. Ct. App.

6

2005). Here, Shanda waited over eight years to seek enforcement of the property-settlement agreement. The record shows some of the bills, receipts, and statements Shanda submitted for reimbursement date back to 2006. Although the property-settlement agreement does not specifically delineate the time frame to submit bills, receipts, or invoices to Thomas, a substantial delay in submission could be detrimental to him and implicate the duty of both parties to act in good faith. The lack of specificity in the property-settlement agreement, combined with Shanda's failure to timely submit the invoices or bills, made it impossible for Thomas to meet his obligation under the property-settlement agreement (i.e., to afford to pay his half of all expenses). *See Evans*, 75 So. 3d at 1087 (¶14).

¶18. For these reasons, we find the chancellor erred in finding Thomas in contempt for his failure to pay his portion of expenses. We reverse and remand for further consideration of two matters: the sufficiency of the documentation provided by Shanda in support of the expenses, and the timeliness of the submission of the bills or invoices.

> II. *Whether the chancellor erred in finding Thomas in contempt for his failure to pay child support.*

¶19. Thomas next argues the chancellor erred in finding him in contempt of court "for [his] failure to pay child support in the amount of $708 while, at the same time, finding that he had overpaid child support by $4,200." He claims "[t]he two findings are incompatible." We agree.

¶20. A review of the record shows that the $708 child-support arrearage occurred before the modified wage-withholding order was issued. In other words, at the time the modified

order was issued, Thomas owed $708 in child support. Yet, after the modified order was issued in 2009, Thomas overpaid by $4,200. Thus, at the time Shanda filed her complaint in 2014, and at the time of trial in 2015-2016, Thomas was not behind in child support but, instead, had actually overpaid. As a result, the chancellor erred in finding Thomas in contempt for his failure to pay child support. Accordingly, we reverse and render on this issue.

> III. *Whether the chancellor erred in failing to find Shanda in contempt for her noncompliance with the property-settlement agreement.*

¶21. Thomas further argues the chancellor erred in failing to find Shanda in contempt of court for her failure to comply with the property-settlement agreement. Specifically, Thomas alleges Shanda violated the property-settlement agreement by: (a) denying him visitation with the children, (b) failing to communicate with him regarding the children's medical appointments and school functions, (c) failing to notify him when she and the children traveled out of town, (d) failing to return his personal belongings after the divorce, and (e) failing to timely refinance the marital home. We separately address each allegation.

> A. *Visitation*

¶22. Thomas claims Shanda often denied him weekend, summer, and holiday visitation with the children. He further claims that when Shanda did allow him weekend visitation, she would ask that he bring the children back on Saturday night so they could attend church.

¶23. When asked what weekends he was denied visitation, Thomas responded he did not have actual dates but that it occurred on "numerous occasions [over] the past seven or eight

8

years." Additionally, Thomas was unable to specify which years he did not get the children for Thanksgiving. He ultimately acknowledged that he "should have been writing [it] all down all the years."

¶24. Additionally, Thomas admitted he would voluntarily return the children on Saturday night in order to avoid "a big argument." Despite his assertion on appeal, Thomas advised the chancellor at trial that he did not intend to have the court hold Shanda in contempt because he voluntarily brought the kids home on Saturdays.

¶25. Shanda admitted that she has occasionally denied Thomas visitation with the children but explained that it was only during those times when Thomas had no place to live or was struggling with a drug problem. Thomas acknowledged that he has lived with three different women since the divorce and has been married twice. He further acknowledged that he has not owned a house since the divorce and has lived in six to eight different places since moving out of the marital home. Moreover, Thomas admitted to having a drug problem and to taking his son's Attention Deficit Hyperactivity Disorder medication.

¶26. The record shows that despite Thomas's lack of a residence, Shanda would allow Thomas to stay at her house with the children in order for him to have his weekend visitation. She would also allow him to use her car when he was without transportation.

¶27. Regarding holiday visitation, Shanda explained that Thomas has had numerous work schedules over the years and has had to work on holidays, including Christmas Day. As a result, Shanda would accommodate his work schedule and adjust the children's visitation

accordingly.

### B. Communication

¶28. Thomas claims Shanda failed to advise him of doctors appointments and school functions. Thomas asserts his biggest complaint about Shanda is that he "would have liked to have been included more."

¶29. While Shanda admitted that she "may not tell [Thomas] every time they go to the doctor for a sinus infection," she denied willfully withholding information from him. She acknowledged that Thomas is not listed on the children's school records as an emergency contact but explained it was because he lived too far from the school.[2]

¶30. Importantly, Thomas acknowledged that he has joint legal custody of the children and, as a result, has equal access to the children's school and medical information. Additionally, Thomas acknowledged that information regarding school functions is available online for him to access. He agreed that Shanda has never refused to tell him information such as teacher names and, moreover, acknowledged that he could ask his children if he wanted to know about their schedules and/or school events.

¶31. When testifying regarding the expenses related to medical and/or school and extracurricular activities, Thomas initially stated that Shanda "probably" told him how much it cost because "[k]nowing Shanda[,] she's pretty much by the book." Yet, after hearing

---

[2] The children go to school in Jackson County, Mississippi. Thomas lives in Mobile, Alabama.

Shanda's testimony, Thomas's testimony changed. Thomas subsequently testified that despite his former testimony, he no longer believed Shanda was a good mother.

### C. Out-of-Town Travel

¶32. The property-settlement agreement states that any out-of-town or out-of-state travel with the children shall be coordinated between the parties and each parent shall keep the other generally informed of the children's whereabouts. Thomas claims Shanda failed to notify him when she traveled out of town or state with the children.

¶33. Shanda admits to traveling out of town with the children without first advising Thomas. She explained that although she signed the property-settlement agreement, she did not recall that provision or requirement. Regardless, Shanda testified as follows:

[Counsel]: Did you take [the children] to Tennessee or somewhere [Thomas] didn't know about?

[Shanda]: Not that I know of.

[Counsel]: All right. Did you call and tell him I'm bringing them from Hurley to Pascagoula today? I'm leaving town and coming –

[Shanda]: No, sir.

[Counsel]: All right. Has he mentioned that to you that he's upset today because you didn't tell him you were leaving Hurley –

[Shanda]: No, sir.

[Counsel]: – and coming to Pascagoula?

[Shanda]: No, sir.

. . . .

[Counsel]:    And if he takes the children out of Mobile to Saraland or to any – does he call and say hey, we're going to Saraland?

[Shanda]:    No, sir.

### D.    Thomas's Personal Belongings

¶34.    Thomas further claims Shanda has "kept, and is using, personal items and family heirlooms belonging to [him] and which he was awarded in the property settlement agreement." Specifically, Thomas claims Shanda has failed to return a rocking chair, a "whatnot shelf," a walnut chest of drawers, a maple chest of drawers, and a coffee table.

¶35.    The property-settlement agreement did not specifically award these items to Thomas. Instead, the property-settlement agreement provided that Thomas would "retain possession of his personal belongings." The record shows the items at issue belonged to Thomas's mother and were acquired when Shanda and Thomas moved into their marital home. The record further shows Thomas moved out of the marital home before the divorce was final and left those items in the home. Shanda testified that Thomas left the items since they would be safe in the home and because he moved around so much after the divorce.

¶36.    Additionally, Shanda testified that there was no rocking chair or coffee table, the "whatnot shelf" was in their son's room, the walnut chest of drawers was in their daughter's room, and the maple chest of drawers was in her room. Importantly, Shanda advised that although Thomas took what he wanted when he moved out prior to the divorce, he was welcome to come get those items.

### E.    Refinance of the Marital Home

12

¶37. The property-settlement agreement required Shanda to refinance the marital home within "two years after the date of divorce and remove [Thomas's] name from same." Thomas asserts Shanda failed to timely refinance the home.

¶38. Although Shanda did ultimately refinance the home, she admitted that it did not occur within two years of the divorce. Shanda explained that she simply did not have the thousands of dollars it was going to cost to refinance at that time, and discussed it with Thomas.

¶39. At trial, the chancellor inquired as to whether Thomas's credit was damaged as a result of Shanda's failure to timely refinance. Thomas testified that he did not think there were any late payments made on the marital home during the time Shanda failed to refinance. Yet, he "believed" his credit had been damaged since the marital home "came up" when he and his wife tried to obtain a loan for their home.

¶40. Thomas advised the chancellor that he did not currently have a mortgage and has not had a mortgage since the 2006 divorce. He explained that he and his wife purchased their home though his wife and mother-in-law's limited liability company because they "flip houses." According to Thomas, they decided to "keep" one of the houses that had been flipped. He clarified that there was no loan on the home.

¶41. "To be found in contempt, a party has to willfully and deliberately violate a court order." *McKnight v. Jenkins*, 155 So. 3d 730, 732 (¶7) (Miss. 2013). While the record indicates that Shanda did not always comply with the property-settlement agreement, there is no evidence that she willfully and deliberately violated the court's order. Indeed, there is

13

no evidence in the record to suggest that Shanda's actions were done with the intent to frustrate the court's order. Thus, the chancellor did not err in failing to find Shanda in contempt of court. We therefore affirm this issue.

 *IV. Whether the chancellor erred in awarding Shanda attorney's fees.*

¶42. Thomas last argues the chancellor erred in awarding Shanda attorney's fees. "When a party is held in contempt for violating a valid judgment of the court, then attorney's fees should be awarded to the party that has been forced to seek the court's enforcement of its own judgment." *Webster v. Webster*, 17 So. 3d 602, 609 (¶19) (Miss. Ct. App. 2009).

¶43. Because the chancellor erred in finding Thomas in contempt of court, we find the award of attorney's fees should be reversed and remanded. Upon remand, should the chancellor, after consideration of Shanda's sufficiency and timeliness of the bills and expenses, find that Thomas remains in contempt of court, an award of attorney's fees may be considered.

¶44. **AFFIRMED IN PART, REVERSED AND RENDERED IN PART, AND REVERSED AND REMANDED IN PART.**

 **BARNES AND CARLTON, P.JJ., WILSON, GREENLEE, WESTBROOKS, TINDELL, McDONALD AND McCARTY, JJ., CONCUR. LAWRENCE, J., NOT PARTICIPATING.**